**MAINSTREAM LOUDOUN,
et al., Plaintiffs,**

v.

**BOARD OF TRUSTEES OF THE
LOUDOUN COUNTY LIBRARY,
et al., Defendants.**

**Civil Action No. 97–2049–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

April 7, 1998.

---

Robert Corn–Revere, Hogan & Hartson, Washington, DC, for Plaintiff.

Kenneth Bass III, Venable, Baetjer & Howard, McLean, VA, for Defendant.

## MEMORANDUM OPINION AND ORDER

BRINKEMA, District Judge.

Before the Court are defendants' Motion to Dismiss the Individual Defendants and Motion to Dismiss for Failure to State a Claim or, in the Alternative, for Summary Judgment, in a case of first impression, involving the applicability of the First Amendment's free speech clause to public libraries' content-based restrictions on Internet access.

## I. Background

The plaintiffs in this case are an association, Mainstream Loudoun, and ten individual plaintiffs, all of whom are both members of Mainstream Loudoun and adult patrons of Loudoun County public libraries. Defendants are the Board of Trustees of the Loudoun County Public Library, five individual Board members, and Douglas Henderson, Loudoun County's Director of Library Services. The Loudoun County public library system has six branches and provides patrons with access to the Internet and the World Wide Web. Under state law, the "management and control" of this library system is vested in a Board of Trustees (the "Library Board"). See Va.Code Ann. § 42.1–35. Library Board members are appointed by County officials and are not elected. See id. In addition to their management and control duties, Virginia Code § 42.1–35 directs the Library Board to "adopt such bylaws, rules and regulations for their own guidance and for the government of the free public library system as may be expedient."

On October 20, 1997, the Library Board voted to adopt a "Policy on Internet Sexual Harassment" (the "Policy"), which requires that "[s]ite-blocking software ... be installed on all [library] computers" so as to: "a. block child pornography and obscene material (hard core pornography)"; and "b. block material deemed Harmful to Juveniles under applicable Virginia statutes and legal precedents (soft core pornography)." To implement the Policy, the Library Board chose "X–Stop," a commercial software product intended to limit access to sites deemed to violate the Policy.

Plaintiffs allege that the Policy impermissibly blocks their access to protected speech such as the Quaker Home Page, the Zero Population Growth website, and the site for the American Association of University Women–Maryland. Complaint ¶¶ 96–105. They also claim that there are no clear criteria for blocking decisions and that defendants maintain an unblocking policy that unconstitutionally chills plaintiffs' receipt of constitutionally protected materials. Complaint ¶¶ 92, 95, 127–129.

Based on the above allegations, plaintiffs bring this action under 42 U.S.C. § 1983 against the Library Board and against five individual Library Board members in both their personal and official capacities, and Director of Library Services Douglas Henderson in his official capacity. Plaintiffs allege that the Policy imposes an unconstitutional restriction on their right to access protected speech on the Internet, and seek declaratory and injunctive relief, as well as costs and attorneys' fees pursuant to 42 U.S.C. § 1988.[1]

---

1. In a February 24, 1998 Order, this Court granted a Motion to Intervene as Plaintiffs made by several individuals and organizations which publish speech on the Internet. Intervenors argue that defendants have unconstitutionally interfered with their First Amendment rights as speakers to communicate with Loudoun County library patrons. The intervenors' claim is not explicitly at issue in the motions now before the Court.

## II. Immunity Issues

In their Motion to Dismiss the Individual Defendants, the individual Library Board members (the "individual defendants") argue that they are entitled to absolute and qualified immunity and that suing them individually is redundant given plaintiffs' action against the Board itself.

### A. *Legislative Immunity*

■ The individual defendants argue that they are entitled to absolute immunity for their decision to adopt the Policy. As defendants point out, "[i]t is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities." *Bogan v. Scott-Harris,* —— U.S. ——, 118 S.Ct. 966, 969, —— L.Ed.2d —— (1998); *see Lake Country Estates v. Tahoe Regional Planning Agency,* 440 U.S. 391, 404, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). Legislative immunity bars not only actions for damages but also § 1983 actions for declaratory and injunctive relief. *See Supreme Ct. of Va. v. Consumers Union,* 446 U.S. 719, 732, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980). Such immunity applies both to the legislative body itself and to its individual members. *See id.* 446 U.S. at 733–34. Legislative immunity is premised on the notion that "a private civil action, whether for an injunction or damages, creates a distraction and forces [legislators] to divert their time, energy, and attention from their legislative tasks to defend the litigation." *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 503, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). The Supreme Court has also recognized that the threat of civil liability robs legislators of the courage necessary to legislate for the public good. *See Tenney v. Brandhove,* 341 U.S. 367, 377, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); *see also Lake Country,* 440 U.S. at 405.

■ This term, in *Bogan,* the Supreme Court explicitly extended absolute immunity to local government officials, finding that such officials "are likewise absolutely immune from suit under § 1983 for their legislative activities." *See Bogan,* 118 S.Ct. at 970; *see also Bruce v. Riddle,* 631 F.2d 272 (4th Cir.1980) (finding legislative immunity for local legislators). The Court held that city council members acted in a legislative capacity when they voted to adopt an ordinance eliminating the respondent's department, and were therefore entitled to absolute immunity. *See id.*

Plaintiffs argue that Library Board members should not be entitled to legislative immunity because they are appointed rather than elected, and as such lack a direct electoral check on their actions. Plaintiffs rely heavily on Justice Marshall's dissent in *Lake Country,* in which he stated:

> To cloak [appointed] officials with absolute protection where control by the electorate is so attenuated subverts the very system of checks and balances that the doctrine of legislative privilege was designed to secure. Insulating appointed officials from liability, no matter how egregious their "legislative" misconduct, is unlikely to enhance the integrity of the legislative process.

*Lake Country,* 440 U.S. at 407 (Marshall, J., dissenting). The Supreme Court, however, rejected Justice Marshall's argument in both *Lake Country* and *Bogan* in favor of a functional analysis of legislative immunity. *See Lake Country,* 440 U.S. 391, 403–06, 99 S.Ct. 1171, 59 L.Ed.2d 401 (granting legislative immunity to decisions of unelected regional body); *Bogan,* 118 S.Ct. at 971. Specifically, the Court explained in *Bogan* that legislative immunity was premised on the notion that "the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability," and that this rationale applied equally to state, regional, and local legislators. *Bogan,* 118 S.Ct. at 971; *see also Bruce,* 631 F.2d at 277–80 (adopting functional analysis of *Lake Country* and finding that absolute immunity applied to legislative decisions of local officials). Based on this authority, we reject plaintiffs' argument.

■ It is clear in this case that the Library Board's decision to adopt the Policy was legislative in nature. Virginia Code § 42.1–35 gives the Library Board legislative authority to create and adopt rules and by-laws for the governance of the library system, and the Policy was enacted pursuant to that authority. Moreover, the Policy is prospective in nature, and of general application.

In contrast, the examples given by plaintiffs of non-legislative acts are individual and adjudicative in nature and do not pertain here. *See Scott v. Greenville Co.,* 716 F.2d 1409, 1423 (4th Cir.1983) (wrongful withholding of building permit); *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal, Va.,* 865 F.2d 77, 79 (4th Cir.1989) (withholding of sewer service). Like the City Council's adoption of an ordinance in *Bogan,* the Library Board's adoption of the Policy was essentially a discretionary exercise of rulemaking authority. As such, it is properly treated as legislative in nature. Accordingly, under *Bogan,* the Library Board and its members are entitled to absolute immunity for their decision to adopt the Policy.

■ However, in addition to promulgating Library rules and regulations, the Library Board is also charged with the "management and control of [the] free public library system." Va.Code Ann. § 42.1–35. The Library Board therefore has a prominent role in enforcing the policy it has chosen to adopt. Plaintiffs' allegations specifically target the Library Board's enforcement activities, in a section entitled "Implementation of the Policy." Complaint ¶ 70. Indeed, one aspect of the Board's enforcement role, its choice of the filtering software used to block "pornography," is a central issue in the instant action.

In *Consumers Union,* the Court held that the Virginia Supreme Court acted in a legislative capacity when it promulgated the Virginia Code of Professional Responsibility, and was therefore entitled to absolute immunity for its legislative decisions. *See* 446 U.S. at 734. However, the Court allowed a § 1983 action for declaratory and injunctive relief to continue against the Virginia court because it found that the court also played a non-legislative role in enforcing the Code. As such, the Virginia Supreme Court could properly be enjoined from enforcing the

rules it had promulgated. *Id.* at 736.[2] Following *Consumers Union,* we find that the Library Board and its members are not entitled to legislative immunity in their enforcement role. *See id.* at 734–36. Plaintiffs may therefore properly sue the Library Board and its individual members for declaratory and injunctive relief under § 1983 to prevent them from enforcing the Policy.[3] *See id.*

## B. *Communications Decency Act Immunity*

■ Defendants also claim that they are immune from suit under section 509 of the Telecommunications Act of 1996, now codified at 47 U.S.C. § 230. Section 230 is entitled "Protection for private blocking and screening of offensive material," and provides at § 230(c)(2) that:

> No provider or user of an interactive computer service shall be held liable on account of ... any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected.

The Act defines "interactive computer service" to include "a service or system that provides access to the Internet [that is] offered by libraries or educational institutions." 47 U.S.C. § 230(e)(2). Based on the above language, defendants argue that they are absolutely immune from suit for their decision to promulgate and enforce the Policy.

■ Although defendants' interpretation of § 230(a)(2) is facially attractive, it is not supported by that section's legislative history or relevant case law. At the beginning of § 230, Congress states that "[i]t is the policy of the United States ... to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by

---

2. Although the Court allowed the action to continue, it held that an award of costs and attorneys' fees pursuant to 42 U.S.C. § 1988 was inappropriate because any such award was premised on the Virginia court's legislative activities, for which they enjoyed absolute immunity. *See id.* 446 U.S. at 738–39.

3. As in *Consumers Union,* plaintiff's request for costs and attorneys' fees pursuant to 42 U.S.C. § 1988 may be inappropriate if premised on the Library Board's decision to adopt the Policy, a decision made in its legislative capacity. *See Consumers Union,* 446 U.S. at 738–39. We need not and do not make such a determination at this early stage in the litigation.

federal or state regulation." 47 U.S.C. § 230(b)(2). Interpreting § 230, the Fourth Circuit has explained that:

> The purpose of [§ 230] statutory immunity is not difficult to discern. Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum.

*Zeran v. America Online Inc.*, 129 F.3d 327, 330 (4th Cir.1997). The Fourth Circuit went on to explain that "[a]nother important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive materials over their services." *Id.* at 331. Thus, as its name implies, § 230 was enacted to minimize state regulation of Internet speech by encouraging *private* content providers to self-regulate against offensive material; § 230 was not enacted to insulate government regulation of Internet speech from judicial review. Even if § 230 were construed to apply to public libraries, defendants cite no authority to suggest that the "tort-based" immunity to "civil liability" described by § 230 would bar the instant action, which is for declaratory and injunctive relief. *See* 47 U.S.C. § 230(a)(2); *Zeran*, 129 F.3d at 330. We therefore hold that 47 U.S.C. § 230 does not bar this action.

### C. Eleventh Amendment Immunity

■ Although the issue was not raised in the pleadings, at oral argument the parties raised the possibility that plaintiffs' suit might be barred by the Eleventh Amendment to the United States Constitution. The Eleventh Amendment bars federal claims against states and state officials for money damages and other retrospective relief. *See Edelman v. Jordan*, 415 U.S. 651, 666–67, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Republic of Paraguay v. Allen*, No. 96–2770, 1998 WL 19933 (4th Cir. Jan.22, 1998). "A state and its officers are not entitled to Eleventh Amendment protection, however, where a plaintiff seeks only prospective, injunctive relief." *Gray v. Laws*, 51 F.3d 426, 430 n. 1 (4th Cir.1995); *see Edelman*, 415 U.S. at 664–68. The same is true for awards of costs and attorneys' fees made pursuant to 42 U.S.C. § 1988. *See Hutto v. Finney*, 437 U.S. 678, 694, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Accordingly, in the instant case, the Eleventh Amendment does not bar plaintiffs' § 1983 action for declaratory and injunctive relief and attorneys' fees against the Library Board or its individual members.

### D. Qualified Immunity

■ In the alternative, the individual defendants argue that, in promulgating and enforcing the Policy, they are entitled to qualified immunity against the present suit. Public officials are entitled to qualified immunity from liability for acts that do not "violate clearly established statutory or constitutional principles of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). However, as defendants concede, qualified immunity does not apply to actions for prospective, injunctive relief like the one at issue here, *see id.* (qualified immunity shields public officials from civil damages liability), nor does it prevent an award of attorneys' fees pursuant to 42 U.S.C. § 1988 against public officials acting in their official capacity. *See Pulliam v. Allen*, 466 U.S. 522, 543–44, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984). Therefore, given the relief sought by plaintiffs, the individual defendants are not entitled to qualified immunity for the promulgation and enforcement of the Policy.

### E. The Real Party in Interest

■ Finally, defendants argue that plaintiffs' suit against the individual defendants is redundant because the Library Board itself is already a party. We agree. As the Supreme Court has recognized, "official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Here, plaintiffs' suit against the Library Board itself, if successful, will provide plaintiffs with full relief against enforcement

of the Policy. Moreover, the nine-person Library Board appears to act only by the consensus decisions of its members. As such, plaintiffs' suit against the five Board members who voted to adopt the Policy is impractical as a means to enjoin the Library Board from enforcing the Policy. This Court therefore concludes that the individual Library Board members are unnecessary parties to this action and should be dismissed. Plaintiffs' suit against Douglas Henderson, Director of Library Services, is similarly unnecessary because Henderson is sued solely as a surrogate for the Board itself; moreover, a judgment against him cannot be expected to provide plaintiffs with complete relief against enforcement of the Policy. Accordingly, he will be dismissed as well.

## III. Standing

■ Defendants argue that plaintiffs lack standing to pursue this action because neither the individual plaintiffs nor Mainstream Loudoun have suffered an actual injury as a result of the Policy. Specifically, defendants allege that no member of Mainstream Loudoun has attempted to access blocked Internet materials in Loudoun County libraries, or petitioned a library to unblock a blocked site. An association has standing to sue on behalf of its members when: "(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of the individual members in the lawsuit." *Maryland Highways Contractors v. Maryland,* 933 F.2d 1246, 1250 (4th Cir.1991); *see Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Defendants contend that the first requirement is not met here because none of the individual plaintiffs has alleged the actual injury necessary to sue on his own behalf.

■ Defendants' argument is contradicted by plaintiffs' Complaint, which alleges that several Mainstream Loudoun members have attempted to access Internet publications at Loudoun County libraries but discovered that the sites had been blocked. *See* Complaint ¶¶ 19, 20, 23. In evaluating a motion to dismiss the Court must treat the allegations in plaintiffs' Complaint as true. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Because these plaintiffs have alleged that their access to particular Internet sites was blocked pursuant to the Policy, their claims survive dismissal.

■ Defendants also allege that no individual plaintiff claims to have requested that a site be unblocked and had that request denied; however, we find that no such allegation is necessary to confer standing. *See Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1943). In *Lamont,* the plaintiff sued to invalidate a federal statute that directed the Postmaster General not to deliver a publication deemed "communist propaganda" without a written request from the plaintiff. *See id.* 381 U.S. at 302–04. Plaintiff refused to make such a written request, claiming that the requirement imposed an unconstitutional burden on his First Amendment right to receive protected speech. *See id.* at 304–05. Despite plaintiff's refusal to seek access to restricted materials, the Supreme Court allowed him to maintain his First Amendment claim. *See id.* In accordance with *Lamont,* the plaintiffs in this case need not allege that they actually requested that a particular site be unblocked. Instead, plaintiffs need only allege that they were unable to access otherwise protected materials as a result of the Policy. Because the Complaint contains such allegations, the first requirement of *Maryland Highways Contractors* is satisfied here. *See* 933 F.2d at 1250.

■ Defendants also allege that Mainstream Loudoun does not satisfy the third requirement of *Maryland Highways Contractors* because the interests of individual members may be in conflict with Mainstream Loudoun's interest in pursuing this action. The Fourth Circuit has held that associations lack standing where "there are actual conflicts of interest which would require that the individual members come into the lawsuit to protect their interests." *Id.* at 1252–53. As evidence of an actual conflict, defendants point to Mainstream Loudoun's allegation that: "We reflect countless races, religions and lifestyles, and we often differ on ques-

.tions of morality and behavior." Complaint ¶ 12. However, defendants ignore Mainstream Loudoun's additional claim that its unifying goal is "to ensur[e] a free and open society that preserves religious and personal freedom as established by the U.S. Constitution." Complaint ¶ 12. That Mainstream Loudoun has a diverse membership does not, by itself, demonstrate the existence of an actual conflict of interest in this case. Moreover, plaintiffs have alleged that a judgment invalidating the Policy will completely satisfy the interests of the association's members. As such, Mainstream Loudoun appears to satisfy all of the elements needed to have standing. For these reasons, Mainstream Loudoun will not be dismissed from this action.

■ Finally, defendants correctly note that several plaintiffs fail to allege that they ever attempted to access an Internet site blocked pursuant to the Policy. *See* Complaint ¶¶ 15–18, 21–22, 24–25 (plaintiffs Judy Coughlin, Henry Taylor, Ann Curley, Judith Hines, Kathryn Kern–Levine, Michael Clay, Jerome Smith, and Mary Adams). Without that allegation, these individual plaintiffs cannot claim that they were ever denied access to constitutionally protected speech. As such, they have not alleged an actual injury sufficient to maintain standing. *See Northeastern Fla. Contractors v. Jacksonville,* 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). These individual plaintiffs must therefore be dismissed from this action.

## IV. Plaintiffs' First Amendment Claim

In their Motion to Dismiss for Failure to State a Claim, or, in the Alternative, for Summary Judgment, defendants concede that the Policy prohibits access to speech on the basis of its content. *See* Def. Brief at 11. However, defendants argue that the "First Amendment does not in any way limit the decisions of a public library on whether to provide access to information on the Internet." Def. Brief at 2. Indeed, at oral argument, defendants went so far as to claim that a public library could constitutionally prohibit access to speech simply because it was authored by African–Americans, or because it espoused a particular political viewpoint, for example pro-Republican. *See* Feb. 27, 1998 Hearing Transcript at 48. Thus, the central question before this Court is whether a public library may, without violating the First Amendment, enforce content-based restrictions on access to Internet speech.

■ No cases directly address this issue. However, the parties agree that the most analogous authority on this issue is *Board of Education v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), in which the Supreme Court reviewed the decision of a local board of education to remove certain books from a high school library based on the board's belief that the books were "anti-American, anti-Christian, anti-Sem[i]tic, and just plain filthy." *Id.* 457 U.S. at 856. The Second Circuit had reversed the district court's grant of summary judgment to the school board on plaintiff's First Amendment claim. A sharply-divided Court voted to affirm the Court of Appeal's decision to remand the case for a determination of the school board's motives. However, the Court did not render a majority opinion. Justice Brennan, joined by three Justices, wrote what is commonly referred to as the "plurality" opinion. Justice Brennan held that the First Amendment necessarily limits the government's right to remove materials on the basis of their content .from a high school library. *See id.* at 864–69 (plurality op.). Justice Brennan reasoned that the right to receive information is inherent in the right to speak and that "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." *Id.* at 866 (quoting *Griswold v. Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)); *see also Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) ("the Constitution protects the right to receive information and ideas"). Justice Brennan explained that this principle was particularly important given the special role of the school's library as a locus for free and independent inquiry. *See id.* 457 U.S. at 869. At the same time, Justice Brennan recognized that public high schools play a crucial inculcative role in "the preparation of individuals for participation as citizens" and are therefore entitled to great discretion "to establish and apply their curriculum in such a way as to transmit community values." *Id.* at 863–64 (quoting *Ambach*

*v. Norwick,* 441 U.S. 68, 76–77, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979) (internal quotation marks omitted)). Accordingly, Justice Brennan held that the school board members could not remove books "simply because they dislike the ideas contained [in them]," thereby "prescrib[ing] what shall be orthodox in politics, nationalism, religion, or other matters of opinion," but that the board might remove books for reasons of educational suitability, for example pervasive vulgarity. *Id.* 457 U.S. at 872 (quoting *West Va. Bd. of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)) (internal quotation marks omitted).

In a concurring opinion, Justice Blackmun focused not on the right to receive information recognized by the plurality, but on the school board's discrimination against disfavored ideas. Justice Blackmun explicitly recognized that *Pico* 's facts invoked two significant, competing interests: the inculcative mission of public high schools and the First Amendment's core proscription against content-based regulation of speech. *See id.* 457 U.S. at 876–79 (Blackmun, J., concurring). Justice Blackmun noted that the State must normally demonstrate a compelling reason for content-based regulation, but that a more limited form of protection should apply in the context of public high schools. *See id.* at 877–78. Balancing the two principles above, Justice Blackmun agreed with the plurality that the school board could not remove books based on mere disapproval of their content but could limit its collection for reasons of educational suitability or budgetary constraint. *See id.* at 879.

Dissenting, Chief Justice Burger, joined by three Justices, concluded that any First Amendment right to receive speech did not affirmatively obligate the government to provide such speech in high school libraries. *See id.* at 888 (Burger, C.J., dissenting). Chief Justice Burger reasoned that although the State could not constitutionally prohibit a speaker from reaching an intended audience, nothing in the First Amendment requires public high schools to act as a conduit for particular speech. *See id.* at 885–89. Chief Justice Burger explained that such an obligation would be inconsistent with public high schools' inculcative mission, which necessarily requires schools to make content-based choices among competing ideas in order to establish a curriculum and educate students. *See id.* at 889.

Defendants contend that the *Pico* plurality opinion has no application to this case because it addressed only decisions to remove materials from libraries and specifically declined to address library decisions to acquire materials. *See id.* at 861–63, 871–72 (plurality op.). Defendants liken the Internet to a vast Interlibrary Loan system, and contend that restricting Internet access to selected materials is merely a decision not to acquire such materials rather than a decision to remove them from a library's collection. As such, defendants argue, the instant case is outside the scope of the *Pico* plurality.

In response, plaintiffs argue that, unlike a library's collection of individual books, the Internet is a "single, integrated system." Pl. Brief at 14 (quoting *ACLU v. Reno,* 929 F.Supp. 824, 838 (E.D.Pa.1996)), *aff'd,* —— U.S. ——, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). As plaintiffs explain, "[t]hough information on the Web is contained in individual computers, the fact that each of these computers is connected to the Internet through [World Wide Web] protocols allows all of the information to become part of a single body of knowledge." Pl. Brief at 15 (quoting *Reno,* 929 F.Supp. at 836). Accordingly, plaintiffs analogize the Internet to a set of encyclopedias, and the Library Board's enactment of the Policy to a decision to "black out" selected articles considered inappropriate for adult and juvenile patrons.

After considering both arguments, we conclude that defendants have misconstrued the nature of the Internet. By purchasing Internet access, each Loudoun library has made all Internet publications instantly accessible to its patrons. Unlike an Interlibrary loan or outright book purchase, no appreciable expenditure of library time or resources is required to make a particular Internet publication available to a library patron. In contrast, a library must actually expend resources to restrict Internet access to a publication that is otherwise immediately available. In effect, by purchasing one such publication, the library has purchased them all. The Internet therefore more close-

ly resembles plaintiffs' analogy of a collection of encyclopedias from which defendants have laboriously redacted portions deemed unfit for library patrons. As such, the Library Board's action is more appropriately characterized as a removal decision. We therefore conclude that the principles discussed in the *Pico* plurality are relevant and apply to the Library Board's decision to promulgate and enforce the Policy.

Plaintiffs also contend that the plurality's decision in *Pico* establishes a blanket rule that removal decisions by libraries may not be resolved on summary judgment. We find plaintiffs' reading of *Pico* to be oversimplistic. It is true that a majority of the *Pico* Court voted to remand the case for a determination of the school board's motives, impliedly rejecting the unfettered discretion defendants claim. *See id.* at 875. At the same time, however, a majority of the Court could not agree on the degree of discretion available to school libraries. *See id.* at 856 (plurality op.); 875 (Blackmun, J., concurring); *cf. id.* at 883 (White, J., concurring). Nor did any of the *Pico* Justices directly address the special circumstances that obtain in public libraries. It would therefore be inappropriate for this Court to deny defendants' Motion without first determining the scope of discretion available to the Library Board to remove materials on the basis of their content.

Defendants argue that any limitation on their discretion to remove materials would force them to act as an unwilling conduit of information, and urge this Court to adopt the position of the *Pico* dissent. Defendants interpret the dissent to mean that they are entitled to unfettered discretion in deciding what materials to make available to library patrons.

Adopting defendants' position, however, would require this Court to ignore the *Pico* plurality's decision to remand the case, as discussed above. Moreover, all of the *Pico* Justices, including the dissenters, recognized that any discretion accorded to school libraries was uniquely tied to the public school's role as educator. *See id.* at 863–64, 869–71 (plurality op.); 875–76, 879 (Blackmun, J., concurring) ("Certainly, the unique environment of the school places substantial limits on the extent to which official decisions may be restrained by First Amendment values.");

*cf. id.* at 889–92 (Burger, C.J., dissenting) ("Whatever role the government might play as a conduit of information, schools in particular ought not be made a slavish courier of the material of third parties .... How are 'fundamental values' to be inculcated except by having school boards make content-based decisions about the appropriateness of retaining materials in the school library and curriculum[?]"); 909–10 (Rehnquist, J., dissenting) ("When it acts as an educator ... the government is engaged in inculcating social values and knowledge in relatively impressionable young people .... In short, actions by the government as educator do not raise the same First Amendment concerns as actions by the government as sovereign."); 921 (O'Connor, J., dissenting) (stating that "in this case the government is acting in its special role as educator"). Of even more significance to our case is Justice Rehnquist's observation that high school libraries must be treated differently from public libraries. *See id.* at 915 (Rehnquist, J., dissenting) ("Unlike university or public libraries, elementary and secondary school libraries are not designed for freewheeling inquiry."). Indeed, Chief Justice Burger and Justice Rehnquist justified giving public schools broad discretion to remove books in part by noting that such materials remained available in public libraries. *See id.* at 892 (Burger, C.J., dissenting) ("Books may be acquired from ... public libraries, or other alternative sources unconnected with the unique environment of the local public schools."); 915 (Rehnquist, J., dissenting) ("[T]he most obvious reason that petitioners' removal of the books did not violate respondents' right to receive information is the ready availability of the books elsewhere .... The books may be borrowed from a public library."). Accordingly, neither the dissent nor the plurality of *Pico* can be said to support defendants' argument that public libraries enjoy unfettered discretion to remove materials from their collections.

■ To the extent that *Pico* applies to this case, we conclude that it stands for the proposition that the First Amendment applies to, and limits, the discretion of a public library to place content-based restrictions on access to constitutionally protected materials within its collection. Consistent with the

mandate of the First Amendment, a public library, "like other enterprises operated by the State, may not be run in such a manner as to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 876 (Blackmun, J., concurring) (quoting *Barnette,* 319 U.S. at 642).

 Furthermore, the factors which justified giving high school libraries broad discretion to remove materials in *Pico* are not present in this case. The plaintiffs in this case are adults rather than children. Children, whose minds and values are still developing, have traditionally been afforded less First Amendment protection, particularly within the context of public high schools. *See Tinker v. Des Moines Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In contrast, adults are deemed to have acquired the maturity needed to participate fully in a democratic society, and their right to speak and receive speech is entitled to full First Amendment protection. Accordingly, adults are entitled to receive categories of speech, for example "pervasively vulgar" speech, which may be inappropriate for children. *See Reno v. ACLU,* — U.S. —, —, 117 S.Ct. 2329, 2346, 138 L.Ed.2d 874 (1997); *Sable Communications v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989).

More importantly, the tension Justice Blackmun recognized between the inculcative role of high schools and the First Amendment's prohibition on content-based regulation of speech does not exist here. *See Pico,* 457 U.S. at 876–80 (Blackmun, J., concurring). Public libraries lack the inculcative mission that is the guiding purpose of public high schools. Instead, public libraries are places of freewheeling and independent inquiry. *See id.* at 914 (Rehnquist, J., dissenting). Adult library patrons are presumed to have acquired already the "fundamental values" needed to act as citizens, and have come to the library to pursue their personal intellectual interests rather than the curriculum of a high school classroom. As such, no curricular motive justifies a public library's decision to restrict access to Internet materials on the basis of their content.

Finally, the unique advantages of Internet speech eliminate any resource-related rationale libraries might otherwise have for engaging in content-based discrimination. The Supreme Court has analogized the Internet to a "vast library including millions of readily available and indexed publications," the content of which "is as diverse as human thought." *Reno,* 117 S.Ct. at 2335. Unlike more traditional libraries, however, there is no marginal cost associated with acquiring Internet publications. Instead, all, or nearly all, Internet publications are jointly available for a single price. Indeed, it costs a library more to restrict the content of its collection by means of blocking software than it does for the library to offer unrestricted access to all Internet publications. Nor do Internet publications, which exist only in "cyberspace," take up shelf space or require physical maintenance of any kind. Accordingly, considerations of cost or physical resources cannot justify a public library's decision to restrict access to Internet materials. *Cf. Pico,* 457 U.S. at 909 (Rehnquist, J., dissenting) (budgetary considerations force schools to choose some books over others); 879 n. 1 (Blackmun, J., concurring) (same).

 In sum, there is "no basis for qualifying the level of First Amendment scrutiny" that must be applied to a public library's decision to restrict access to Internet publications. *Reno,* 117 S.Ct. at 2344. We are therefore left with the First Amendment's central tenet that content-based restrictions on speech must be justified by a compelling governmental interest and must be narrowly tailored to achieve that end. *See Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,* 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). This principle was recently affirmed within the context of Internet speech. *See Reno,* 117 S.Ct. at 2343–48. Accordingly, we hold that the Library Board may not adopt and enforce content-based restrictions on access to protected Internet speech absent a compelling state interest and means narrowly drawn to achieve that end.

 This holding does not obligate defendants to act as unwilling conduits of information, because the Library Board need not provide access to the Internet at all. Having chosen to provide access, however, the Library Board may not thereafter selectively

restrict certain categories of Internet speech because it disfavors their content. In accord with this holding is *Lamont,* discussed *supra,* in which the Court held that the Post Office could not constitutionally restrict access to speech it considered "communist propaganda," stating that " '[t]he United States may give up the post-office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues.' " *Lamont,* 381 U.S. at 305 (quoting *Milwaukee Soc. Dem. Pub. Co. v. Burleson,* 255 U.S. 407, 437, 41 S.Ct. 352, 65 L.Ed. 704 (1921) (Holmes, J., dissenting)); *see id.* 381 U.S. at 310 ("If the Government wishes to withdraw a subsidy or a privilege, it must do so by means and on terms which do not endanger First Amendment rights.") (Brennan, J., concurring). Similarly, in this case, the Library Board need not offer Internet access, but, having chosen to provide it, must operate the service within the confines of the First Amendment.

### A. Obscenity, Child Pornography, and Speech "Harmful to Juveniles"

■ Having determined that a public library must satisfy strict scrutiny before it may engage in content-based regulation of protected speech, we now consider the speech regulated by the Policy. The Policy prohibits access to three types of speech: obscenity, child pornography, and materials deemed "[h]armful to [j]uveniles." Complaint Ex. 1. Obscenity and child pornography are not entitled to the protections of the First Amendment, and the government may legitimately restrict access to such materials. *See New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (child pornography); *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (obscenity). Indeed, "[t]ransmitting obscenity and child pornography, whether via the Internet or other means, is already illegal under federal law for both adults and juveniles." *Reno,* 117 S.Ct. at 2348 n. 44. In the instant case, however, plaintiffs allege that the X–Stop filtering software chosen by defendants restricts many publications which are not obscene or pornographic, including materials unrelated to sex altogether, such as the Quaker's website. *See* Complaint ¶¶ 96–105. Moreover, plaintiffs allege that X–Stop fails to block access to pornographic materials arguably covered by the Policy. *See* Complaint ¶ 127. Most importantly, plaintiffs allege that the decision as to which materials to block is made by a California corporation based on secret criteria not disclosed even to defendants, criteria which may or may not bear any relation to legal definitions of obscenity or child pornography. *See* Complaint ¶¶ 95, 128–29. As such, plaintiffs argue that the means called for by the Policy are not narrowly tailored to any legitimate interest defendants may have in regulating obscenity and child pornography.

■ The Policy also prohibits access to materials which are "deemed Harmful to Juveniles under applicable Virginia statutes and legal precedents." This appears to be a reference to Virginia Code § 18.2–390, which defines materials "Harmful to Juveniles" to include sexual content that:

(a) predominately appeals to the prurient, shameful or morbid interest of juveniles, (b) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for juveniles, and (c) is, when taken as a whole, lacking in serious literary, artistic, political or scientific value for juveniles.

Plaintiffs allege that the Policy improperly limits adult Internet speech to what is fit for children. In support, plaintiffs cite *Reno,* 117 S.Ct. at 2329. In *Reno,* the Supreme Court held that a content-based Internet regulation intended to prevent the transmission of material harmful to minors was unconstitutional because it suppressed speech adults were constitutionally entitled to send and receive. The Court stated:

It is true that we have repeatedly recognized the governmental interest in protecting children from harmful materials. But that interest does not justify an unnecessarily broad suppression of speech addressed to adults. As we have explained, the Government may not "reduc[e] the adult population ... to ... only what is fit for children."

*Id.* 117 S.Ct. at 2346 (quoting *Denver Area Telecomm. Consortium v. FCC,* 518 U.S. 727, 116 S.Ct. 2374, 2393, 135 L.Ed.2d 888 (1996)) (citations omitted). The Court went on to cite *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469

(1983), for the proposition that: "'[R]egardless of the strength of the government's interest' in protecting children, '[t]he level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox.'" *Reno*, 117 S.Ct. at 2346 (quoting *Bolger*, 463 U.S. at 74–75). Applying *Reno* to the instant case, it is clear that defendants may not, in the interest of protecting children, limit the speech available to adults to what is fit for "juveniles." As plaintiffs point out, even when government regulation of content is undertaken for a legitimate purpose, whether it be to prevent the communication of obscene speech or materials harmful to children, the means it uses must be a "reasonable response to the threat" which will alleviate the harm "in a direct and material way." *Turner Broadcasting v. FCC*, 512 U.S. 622, 624, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Plaintiffs have adequately alleged a lack of such reasonable means here. As such, plaintiffs have stated a valid First Amendment claim which may go forward.

## B. *The Unblocking Policy*

██ Defendants contend that, even if the First Amendment limits the Library Board's discretion to remove materials, the unblocking procedure ensures the constitutionality of the Policy because it allows library staff to make certain that only constitutionally unprotected materials are blocked. Under the unblocking policy, library patrons who have been denied access to a site may submit a written request which must include their name, telephone number, and a detailed explanation of why they desire access to the blocked site. The library staff then "decide[s] whether the request should be granted." Def. Brief at 3.[4]

Plaintiffs argue that the unblocking procedure constitutes an unconstitutional burden on the right of library patrons to access protected speech, citing *Lamont*, 381 U.S. at 301. The statute at issue in *Lamont* directed the Postmaster General not to deliver "communist propaganda" to postal patrons unless they first returned to the Post Office a card bearing their names and addresses and spe-

cifically requesting that such materials be sent to them. *See id.* at 302–04. The Supreme Court held the statute to be "unconstitutional because it require[d] an official act (viz., returning the reply card) as a limitation on the unfettered exercise of the addressees' First Amendment rights." *Id.* at 305. In particular, the Court noted the severe chilling effect of forcing citizens to publicly petition the Government for access to speech it clearly disfavored. *See id.* at 307.

Here, as in *Lamont*, the unblocking policy forces adult patrons to petition the Government for access to otherwise protected speech, for example speech "Harmful to Juveniles." Indeed, the Loudoun County unblocking policy appears more chilling than the restriction at issue in *Lamont*, because it grants library staff standardless discretion to refuse access to protected speech, whereas the statute at issue in *Lamont* required postal employees to grant access requests automatically. As such, defendants' alleged unblocking procedure does not in any way undercut plaintiffs' First Amendment claim.

## V. Conclusion

For the reasons set forth above, defendants' Motion to Dismiss the Individual Defendants will be GRANTED, and their Motion to Dismiss for Failure to State a Claim will be GRANTED IN PART as to certain plaintiffs and DENIED in all other respects. As to defendants' Motion in the Alternative for Summary Judgment, this Court holds that several material factual issues remain which mandate against summary judgment at this time. These include, but are not limited to, defendants' justification for the Policy, the Internet sites blocked by X–Stop, and the degree of defendants' knowledge of and control over the sites X–Stop blocks. Accordingly, defendants' Motion in the Alternative for Summary Judgment will also be DENIED. An appropriate order will issue.

### *ORDER*

For the reasons stated in an accompanying Memorandum Opinion, defendants' Motion to Dismiss the Individual Defendants is GRANTED, and it is hereby

---

4. For purposes of defendants' Motion to Dismiss for Failure to State a Claim or, in the Alternative, for Summary Judgment, the Court accepts plaintiffs' description of the unblocking policy as accurate. *See* Complaint ¶¶ 127–29.

ORDERED that defendants John Nicholas, Spencer Ault, Richard Black, Chris Howlett, Mary Ellen Vannederynen, and Douglas Henderson be and are DISMISSED from this action.

As to defendants' Motion to Dismiss for Failure to State a Claim or, in the Alternative, for Summary Judgment, that Motion is GRANTED IN PART, and it is hereby

ORDERED that plaintiffs Judy Coughlin, Henry Taylor, Ann Curley, Judith Hines, Kathryn Kern–Levine, Michael Clay, Jerome Smith, and Mary Adams be and are DISMISSED from this action. In all other respects the Motion is DENIED.

The remaining defendant, Board of Trustees of the Loudoun County Library, is directed to file its answer to the Complaint within eleven (11) days.