**MAINSTREAM LOUDOUN,**
**et al., Plaintiffs,**

v.

**BOARD OF TRUSTEES OF**
**THE LOUDOUN COUNTY**
**LIBRARY, Defendant.**

No. Civ.A. 97–2049–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 23, 1998.

Robert Corn–Revere, Ronald J. Wiltsie, Mary Ellen Callahan, Hogan & Hartson, L.L.P., Washington, DC, Elliot M. Mincberg, Lawrence S. Ottinger, People for the Ameri-

can Way Foundation, Washington, DC, for plaintiff.

Kenneth C. Bass, III, Damon W.D. Wright, Venable, Baetjer and Howard, LLP, McLean, VA, for defendant.

Richard Ferris, American Civil Liberties Union of Virginia, Richmond, VA, Ann Beeson, Christopher A. Hansen, American Civil Liberties Union Foundation, New York City, NY, for plaintiff-intervenors.

## MEMORANDUM OPINION

BRINKEMA, District Judge.

### BACKGROUND

At issue in this civil action is whether a public library may enact a policy prohibiting the access of library patrons to certain content-based categories of Internet publications. Plaintiffs are a Loudoun County non-profit organization, suing on its own behalf and on behalf of its members, and individual Loudoun County residents who claim to have had their access to Internet sites blocked by the defendant library board's Internet policy. They, along with plaintiff-intervenors ("intervenors"), individuals and other entities who claim that defendant's Internet policy has blocked their websites or other materials they placed on the Internet, allege that this policy infringes their right to free speech under the First Amendment. Defendant, the Board of Trustees of the Loudoun County Library, contends that a public library has an absolute right to limit what it provides to the public and that any restrictions on Internet access do not implicate the First Amendment.

The background of this action is fully summarized in this Court's April 7, 1998 Memorandum Opinion and will not be repeated in depth here. On October 20, 1997, defendant passed a "Policy on Internet Sexual Harassment" ("Policy") stating that the Loudoun County public libraries would provide Internet access to its patrons subject to the following restrictions: (1) the library would not provide e-mail, chat rooms, or pornography; (2) all library computers would be equipped with site-blocking software to block all sites displaying: (a) child pornography and obscene material;[1] and (b) material deemed harmful to juveniles; (3) all library computers would be installed near and in full view of library staff; and (4) patrons would not be permitted to access pornography and, if they do so and refuse to stop, the police may be called to intervene. See Pls.Ex. 1. It is the second restriction in the Policy that lies at the heart of this action.

To effectuate the second restriction, the library has purchased X–Stop, commercial site-blocking software manufactured by Log–On Data Corporation. While the method by which X–Stop chooses sites to block has been kept secret by its developers, see Pls.Ex. 16, Dep. of Michael S. Bradshaw ("Bradshaw Dep.") at 12–13, it is undisputed that it has blocked at least some sites that do not contain any material that is prohibited by the Policy.[2]

If a patron is blocked from accessing a site that she feels should not be blocked under the Policy, she may request that defendant unblock the site by filing an official, written request with the librarian stating her name, the site she wants unblocked, and the reason why she wants to access the site. See Intervs. Ex. 21, Request to Review Blocked Site. The librarian will then review the site and manually unblock it if he determines that the site should not be blocked under the Policy. There is no time limit in which a request must be handled and no procedure for notifying the patron of the outcome of a

---

**1.** Although plaintiffs and intervenors have refused to admit that the Internet contains child pornography and obscene materials, defendant has provided unrebutted evidence strongly suggesting that such materials can be found there. For purposes of this opinion we will assume that such materials are accessible through the Internet. See Def.Exs. 4–14; see also Reno v. ACLU, 521 U.S. 844, 117 S.Ct. 2329, 2336, 138 L.Ed.2d 874 ("Sexually explicit material on the Internet includes text, pictures, and chat and 'extends from the modestly titillating to the hardest-

core.'") (citing ACLU v. Reno, 929 F.Supp. 824, 844 (E.D.Pa.1996)).

**2.** Defendant admits to having blocked The Safer Sex Page, the Books for Gay and Lesbian Teens/ Youth page, and the Renaissance Transgender Association page, even though it recognizes that none of them contain prohibited material. See Def.Ex. 18, Def. Answer to Intervs. Sec. Interrogs.

request. *See* Pls.Ex. 18, Deposition of Cindy Timmerman at 93–94. All unblocking requests to date have been approved. *See* Def.Ex. 15, Decl. of Douglas Henderson ("Henderson Decl.") at ¶ 18.

Plaintiffs and intervenors both allege that the Policy, as written and as implemented, violates their First Amendment rights because it impermissibly discriminates against protected speech on the basis of content and constitutes an unconstitutional prior restraint. In response, defendant contends: (1) intervenors do not have standing; (2) the Policy does not implicate the First Amendment and is reasonable; (3) the Policy is the least restrictive means to achieve two compelling government interests; and (4) the library has statutory immunity from this action.

In the motions now before the Court, plaintiffs, intervenors, and defendant each ask the Court to grant summary judgement in their favor. Intervenors also ask the Court to permit them to substitute for three of their parties.[3]

## ANALYSIS

### I. Standing

Defendant alleges that all of the intervenors lack standing. Intervenors include three websites (the Safer Sex Page, Banned Books Online, and the Books for Gay and Lesbian Teens/Youth page), two non-profit corporations with websites (the American Association of University Women and the Renaissance Transgender Association), one for-profit corporation with a website (The Ethical Spectacle), one newspaper columnist whose articles are published on a website (Rob Morse, writer for the *San Francisco Examiner*), and an artist whose work is published on a website (Sergio Arau). *See* February 6, 1998 Mot. Intervene as Pls.

### A. Non–Jural Persons

■ Defendant argues that the three website intervenors lack standing because they are non-jural entities, being neither individual persons nor corporations. While intervenors assert that these three entities do have standing as alleged in their complaint, they have filed a Motion to Substitute Parties to resolve this dispute. In each case, they wish to replace the web page with the individual who owns and operates it. Specifically, intervenors would substitute Christopher Filkins for The Safer Sex Page, John Ockerbloom for Banned Books Online, and Jeremy Meyers for Books for Gay and Lesbian Teens/Youth. These individuals are jural entities with a clear First Amendment interest in communicating the speech they have published via these sites.

■ Defendant contends that the Motion to Substitute Parties should be denied for two reasons. First, defendant alleges it would be prejudiced by adding these individuals as named intervenors at this late stage of the proceedings. All three individuals, however, were named in the original complaint and there has been no problem deposing them or obtaining discovery from and about them. Defendant cannot point to any specific actual or potential prejudice to its case and we find that there would be none. Second, defendant contends that the real party in interest in this litigation is the ACLU, which represents the Renaissance Transgender Association, and that the dismissal of the website intervenors would still leave the Renaissance Transgender Association as an adequate nominal party through which the ACLU could pursue this action. Defendant has not presented a single piece of evidence to substantiate this allegation or to demonstrate that these individuals have not asserted a real injury-in-fact that could be redressed by this Court. Therefore, intervenors' motion to substitute parties will be granted, which moots defendant's argument that these three intervenors do not have standing because they are non-jural entities.

### B. Websites Never Blocked

■ Defendant next alleges that five of the intervenors, John Ockerbloom d/b/a

---

**3.** We have also considered the *Amici* briefs filed by the Commonwealth of Virginia and the National Organization for Women–Dulles, et al., on behalf of defendant. Because we find that the issues raised in these briefs were adequately covered in the briefs submitted by the parties, we do not address them specifically in this Opinion.

Banned Books Online, the American Association of University Women, The Ethical Spectacle, Robert Morse, and Sergio Arau, have no standing because there is no evidence in the record that their websites were ever blocked. To the contrary, intervenors have submitted the Declaration of Alpna Cassidy Sehgal, a staff attorney for the ACLU. *See* Intervs. Decl. N ("Sehgal Decl."). In the Declaration, Sehgal alleges that she visited the Rust Branch of the Loudoun County Public Library on February 2, 1998 and, as a result of the Policy, was denied access, in whole or in part, to the websites of each of the intervenors. *See id.* at ¶¶ 2, 9–12, 14–16, 20.

■ Defendant first alleges that the Declaration should be disregarded pursuant to the lawyer-witness rule. Intervenors respond that the lawyer-witness rule prohibits an attorney who may be called as a witness only from acting as an advocate at trial, and not from assisting with trial preparation. *See, e.g., Culebras Enterprises Corp. v. Rivera–Rios,* 846 F.2d 94 (1st Cir.1988) (finding that lawyers who did substantial pretrial work did not violate lawyer-witness rule because they were not "advocates at trial"). Intervenors' statement of the law is correct. It is undisputed that Sehgal has not and will not act as an advocate in this action. We find no reason to disregard her declaration.

In the alternative, defendant contends that there is a material factual dispute as to whether these five sites were ever blocked. Defendant alleges that it attempted to access the sites of all eight intervenors on February 6, 1998, using a library computer employing the X–Stop software, and that only The Safer Sex Page, the Books for Gay and Lesbian Teens/Youth page, and the Renaissance Transgender Association page were blocked at that time. *See* Def.Ex. 18, Def. Answer to Intervs. Sec. Interrogs. Defendant asserts that this evidence contradicts Sehgal's declaration and, therefore, creates a dispute as to a material fact. Defendant's own witnesses, however, demonstrate the dynamic nature of the Internet, *see* Henderson Decl. at ¶ 14,

and X–Stop, their filtering software. *See* Bradshaw Dep. at 49–51. It is entirely possible that these sites were blocked on February 2 but not blocked four days later.[4] Therefore, we find that the Sehgal declaration is unrebutted evidence that the sites, in whole or in part, were blocked by defendant on February 2, 1998, and therefore that these intervenors will not be denied standing on this basis.

### C. Websites That Were Unblocked

■ As noted above, defendant concedes that it blocked three of the intervenors' sites, The Safer Sex Page, the Books for Gay and Lesbian Teens/Youth page, and the Renaissance Transgender Association page, as of February 6, 1998, even though these sites admittedly did not violate the Policy. *See* Def.Ex. 18, Def. Answer Intervs. Sec. Interrogs. It is undisputed that by May 1998 defendant had unblocked these three sites, *see id.,* and there is no evidence that any of intervenors' sites have been blocked since then. Defendant asserts that none of the intervenors have standing to sue now because their sites are no longer blocked, they do not contain "any material that would even be considered a candidate for blocking," and "there is no reason to expect that any of these web sites will ever be candidates for blocking under the Internet Policy." Def. Mem. Support Motion Summ. J. at 6, 8. Therefore, defendant contends, intervenors cannot meet the burden of demonstrating that they have an "injury that could be redressed if the requested relief is granted." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see also, Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 45–46, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (stating that a plaintiff must demonstrate a "likelihood that the requested relief will redress the alleged injury").

In response, intervenors allege that they have standing to sue if there is a legitimate fear that the policy will be enforced against them, or if defendant, having blocked inter-

---

4. Indeed, one of the websites defendant did find to be blocked on February 6, 1998, the Books for Gay and Lesbian Teens/Youth page, had not been blocked four days earlier when Sehgal had tried to access it, although links from it to other websites were blocked. *See* Sehgal Decl., ¶ 11.

venors' speech on one occasion, is likely to do so again. *See ACLU v. Reno*, 929 F.Supp. 824, 851 (E.D.Pa.1996), *aff'd*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (holding that plaintiffs had standing to bring pre-enforcement facial challenge against the Communications Decency Act). One way to demonstrate that a defendant is likely to block intervenors' speech is to show that it retains unfettered discretion in enforcing the Policy. *See 11126 Baltimore Boulevard, Inc. v. Prince George's County*, 58 F.3d 988, 993–94 (4th Cir.1995) (finding a facial challenge to an ordinance restricting speech appropriate where a plaintiff alleges the ordinance does not contain "specific standards to guide the decisionmaker" or "appropriate procedural safeguards to ensure a prompt resolution").

Intervenors also argue that " 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of the power to hear and determine the case.' " *Commonwealth of Virginia v. Califano*, 631 F.2d 324, 326 (4th Cir.1980) (quoting *United States v. W.T. Grant Co.* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). In *W.T. Grant*, the Supreme Court warned that courts must "beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of resumption." *Id.* at 632 n. 5, 73 S.Ct. 894. The Court further explained that a voluntary cessation of wrongful activity would only moot an action if "the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated." *Id.* at 633, 73 S.Ct. 894. To do otherwise, the Court opined, would leave the defendant "free to return to his old ways." *Id.* at 632, 73 S.Ct. 894.

Defendant has failed to carry its burden of demonstrating that the wrong will not be repeated. Douglas Henderson, defendant's Director of Library Services, has acknowledged that the content and imagery on web-sites frequently changes. *See* Henderson Decl. at ¶ 14 (acknowledging "the changing nature of the WorldWideWeb"). In addition, the materials from one website also may be transferred to another website located at a different address. *See* Intervs. Decl. A, Decl. of Sergio Arau ("Arau Decl.") at ¶ 5. Such changes could lead X–Stop to block even previously unblocked material. Therefore, intervenors are justified in having a reasonable expectation that they may be blocked again in the future.

Furthermore, defendant's concession that none of the intervenors' websites contain or likely will ever contain material that violates the Policy does not prevent intervenors from having standing given defendant's admissions that X–Stop blocks websites that do not violate the Policy and that defendant does not even know what websites X–Stop blocks or how it selects them. *See* Henderson Decl. at ¶ 18 (stating that defendant is aware that X–Stop blocks websites that defendant would not block "if we knew about them"); Bradshaw Dep. at 12–13 (stating that Log–On Data Corp. has refused to provide defendant with the criteria it uses to censor websites); Pls.Ex. 2, Dep. of Douglas Henderson ("Henderson Dep."), at 494 (stating that defendant has never seen a list of the blocked sites). On this record, because defendant cannot "demonstrate that there is no reasonable expectation that the wrong will be repeated," and because a declaratory judgment would provide intervenors with relief, we find that the fact they are currently unblocked does not prevent intervenors from having standing to pursue this action.[5]

### D. Banned Books Online

 Defendant next claims that one of the intervenors, John Ockerbloom d/b/a Banned Books Online, lacks standing because defendant has never blocked his website. Ockerbloom admits that there is no evidence that defendant has ever blocked his website,

5. Even absent the above analysis, intervenors would likely have standing to pursue this action as a challenge to a government action that is "capable of repetition, yet evading review." *See, e.g., Morse v. Republican Party of Virginia*, 517 U.S. 186, 116 S.Ct. 1186, 1213 n. 48, 134 L.Ed.2d 347 (1996). If defendant could evade court challenges to its Policy by unblocking the protected speech only of entities that filed lawsuits against it, it would be able to continue indefinitely its unconstitutional censorship against most of the now 80,000 websites it currently blocks. *See* Pls.Ex. 13, Dep. of Def. Expert David Burt ("Burt Dep."), at 222.

but asserts that he has standing because defendant blocked a link[6] from his website to a website providing the text of *E for Ecstasy*, a book about the history of the drug MDMA. *See* Sehgal Decl. at ¶ 15. Ockerbloom alleges that part of the mission of his website is to provide users with access to censored materials, such as *E for Ecstacy*. Therefore, blocking access to one of the links is a concrete injury to his free speech rights.

The extent to which free speech protection reaches links on the Internet has not been directly addressed by any court. In more traditional contexts, individuals are frequently found to have standing to challenge restrictions on speech in which they have a sufficient interest even where that speech is not originally theirs. For example, owners of adult bookstores can challenge censorship of books they intend to sell,[7] owners of adult movie theaters have standing to protest censorship of movies they intend to show,[8] and library patrons have standing to challenge library policies restricting their exercise of the First Amendment right to receive information.[9] In essence, intervenor Ockerbloom has sought to intervene in this action because he claims to have an interest in the *E for Ecstacy* page, material he explicitly and purposely has made available for use by others.

While this argument is initially appealing, its consequences would be unmanageable. Because of the ease of establishing links to any and every site on the Internet, if we find that Ockerbloom has standing in this case it would be impossible to prevent anyone from asserting standing to protest alleged Internet-related First Amendment harms wherever, whenever, and to whomever they occur. For example, by virtue of the ACLU having placed links to each of the intervenors' web pages on its own Internet site, *see* Def.Ex. 18, thereby asserting an interest in the speech of the intervenors, it would be able to assert the rights of each intervenor in a lawsuit brought only in its own name. Such a result would make a mockery of traditional standing principles. Therefore, we find that John Ockerbloom d/b/a Banned Books On-Line, does not have standing and should be dismissed from this action.

## E. Sergio Arau

■ Defendant also asserts that intervenor Sergio Arau does not have standing because he does not have any material published on the Internet to block. Arau responds that some of his work was blocked as of February 2, 1998, *see* Sehgal Decl. at ¶ 20, and that similar artwork and music of his are currently available on the Internet, although at a new website. *See* Arau Decl. at 5; Arau Decl.Ex. 7. Defendant has not rebutted this evidence. Therefore, we find that Arau's work is currently displayed on the Internet, that it is potentially at risk of being blocked again by defendant, and that he has standing to pursue this action.

## F. Robert Morse

■ Lastly, defendant argues that intervenor Robert Morse, a columnist for the *San Francisco Examiner*, does not have standing because he gave up any First Amendment right in his columns by ceding the intellectual property rights in those columns to his newspaper. Morse counters that there is no legal support for the proposition that by relinquishing intellectual property

---

**6.** "Links" are text, icons, or images located on a web page that allow the user, by the click of a mouse, to switch to another specific document "located anywhere on the Internet." *See Reno v. ACLU*, 521 U.S. 844, 117 S.Ct. 2329, 2335, 138 L.Ed.2d 874 (1997); *see also ACLU v. Reno*, 929 F.Supp. 824, 836–37 (E.D.Pa.1996) (finding that links "are short sections of text or image which refer to another document. Typically the linked text is blue or underlined when displayed, and when selected by the user, the referenced document is automatically displayed, wherever in the world it actually is stored. Links for example are used to lead from overview documents to more detailed documents, from tables of contents to particular pages, but also as cross-references, footnotes, and new forms of information structure.... These links ... are what unify the Web into a single body of knowledge, and what makes the Web unique.").

**7.** *See 11126 Baltimore Boulevard v. Prince George's County*, 58 F.3d 988 (4th Cir.1995).

**8.** *See Drive In Theatres, Inc. v. Huskey*, 435 F.2d 228 (4th Cir.1970).

**9.** *See Kreimer v. Bureau of Police*, 958 F.2d 1242 (3d Cir.1992).

rights in his work an individual also surrenders his First Amendment interest in that work. Indeed, authors and journalists who have given up the copyright to their work can still be sued for defamation resulting from that work and can still offer the First Amendment as a defense to such lawsuits. *See, e.g., Masson v. New Yorker,* 501 U.S. 496, 499, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (noting that "[t]he First Amendment protects authors and journalists who write about public figures"). We find no legal or logical support for defendant's position and, therefore, find that Morse has standing to intervene in this action.

## II. Immunity

▄▄▄▄ Defendant has requested that we reconsider our previous finding that it is not immune from this litigation pursuant to a provision of the 1996 Communications Decency Act granting absolute immunity to good faith users of filtering software. *See* 47 U.S.C. § 230(c)(2)(A). In our previous opinion, we found that § 230 provides immunity from actions for damages; it does not, however, immunize defendant from an action for declaratory and injunctive relief. We see no reason to stray from our earlier decision, which is the law of this case. If Congress had intended the statute to insulate Internet providers from both liability and declaratory and injunctive relief, it would have said so.

## III. Strict Scrutiny Standard

Defendant has also requested that we reconsider our earlier findings (1) that the Policy implicates the First Amendment and (2) that the appropriate standard of review is strict scrutiny.

### A. Implicating the First Amendment

Defendant first contends that the Policy should really be construed as a library acquisition decision, to which the First Amend-

ment does not apply,[10] rather than a decision to remove library materials. Plaintiffs and intervenors contend that this issue has already been decided by this Court and is the law of the case. *See Mainstream Loudoun v. Board of Trustees of the Loudoun County Library, et al.,* 2 F.Supp.2d 783, 794–95 (E.D.Va.1998) ("[T]he Library Board's action is more appropriately characterized as a removal decision"; "[W]e conclude that [*Pico* ] stands for the proposition the First Amendment applies to, and limits, the discretion of a public library to place content-based restrictions on access to constitutionally protected materials within its collection.").

We addressed the acquisition/removal argument at length in our previous decision and defendant has not presented a single new argument or authority to support its position. Indeed, defendant's own expert, David Burt, undercuts its argument by acknowledging that "[f]iltering cannot be rightly compared to 'selection', since it involves an active, rather than passive exclusion of certain types of content." Def.Ex. 21, Rep. of David Burt ("Burt Rep.") at 15. Therefore, we decline to reconsider our earlier ruling on this issue.

### B. Forum Analysis

▄▄▄▄ Next, defendant contends that even if the First Amendment does apply, we should apply a less stringent standard than strict scrutiny. Specifically, defendant argues that because the library is a non-public forum, the Policy should be reviewed by an intermediate scrutiny standard, examining whether it is reasonably related to an important governmental interest. Citing *Kreimer v. Bureau of Police,* 958 F.2d 1242 (3d Cir. 1992), defendant argues that public libraries are non-public fora and, therefore, content-based speech regulations are not subject to the strict scrutiny standard. Rather, it asserts, such regulations need only be "reason-

---

10. Defendant has consistently relied on *Board of Education v. Pico,* 457 U.S. 853, 889, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (Burger, J. dissenting) ("[T]here is not a hint in the First Amendment, or in any holding of this Court, of a 'right' to have the government provide continuing access to certain books."). *Pico,* however, was limited to the context of school libraries. It is

notable that even Justice Rehnquist's dissent in that case explicitly recognized the difference between school libraries, which serve unique education purposes, and public libraries, which are "designed for freewheeling inquiry." *Pico,* 457 U.S. at 915, 102 S.Ct. 2799 (Rehnquist, J. dissenting).

able and viewpoint neutral" to be upheld. Def. Brief in Opp. at 34–37 (citing *International Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 694, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (Kennedy, J. concurring)). Plaintiffs and intervenors respond that defendant has misread *Kreimer* and moreover that the library is a limited public forum in which content-based regulations are subject to strict scrutiny.

Defendant concedes that the Policy is a content-based regulation of speech and that content-based regulations of speech in a limited public forum are subject to strict scrutiny. Def. Brief in Opp. at 36–37. The only issue before us, then, is whether the library is a limited public forum or a non-public forum. In *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court identified three categories of fora for the purpose of analyzing the degree of protection afforded to speech. The first category is the traditional forum, such as a sidewalk or public park. These are "places which by long tradition or by government fiat have been devoted to assembly and debate". *Id.* at 45, 103 S.Ct. 948. Second is the limited or designated forum, such as a school board meeting or municipal theater. This category consists of "public property which the State has opened for use by the public as a place for expressive activity". *Id.* The last category is the non-public forum, such as a government office building or a teacher's mailbox, which is not "by tradition or designation a forum for public communication." *Id.* at 46, 103 S.Ct. 948. It is undisputed that the Loudoun County libraries have not traditionally been open to the public for all forms of expressive activity and, therefore, are not traditional public fora.

A limited public forum is created when the government voluntarily opens a particular forum to the public for expressive activity. *See id.* at 45, 103 S.Ct. 948. The government can create a limited public forum for all, some, or only a single kind of expressive activity. *See, e.g., Kreimer*, 958 F.2d at 1259 (finding that the government had made the public library a limited public forum for the expressive activity of "communication of the written word"). Even though it is not required to operate such a forum, once the government does so it "is bound by the same standards as apply in a traditional public forum." *Perry*, 460 U.S. at 46, 103 S.Ct. 948. Therefore, content-neutral time, place, and manner regulations on the expressive activity or activities allowed are permissible if narrowly tailored to serve a significant government interest while leaving open ample alternative channels of communication, *see Kreimer*, 958 F.2d at 1262. Any content-based restriction, however, must be "narrowly drawn to effectuate a compelling state interest." *Perry*, 460 U.S. at 46, 103 S.Ct. 948.

The only court to have examined whether a public library constitutes a limited public forum is the Third Circuit in *Kreimer*.[11] In determining that the public library constituted a limited public forum,[12] the court considered three factors: government intent; extent of use; and nature of the forum. *See id.* at 1259. We agree that these are the crucial factors in determining whether a forum is a limited or a non-public forum.

#### 1. Government Intent

The record establishes that the Loudoun County government, through defendant library board, intended to create a public fo-

---

11. At issue in *Kreimer* was a First Amendment challenge to content-neutral library rules that addressed only conduct, not access to specific materials. The rules: (1) required persons who were not engaged in "reading, studying, or using library materials" to leave the library; (2) prohibited patrons from engaging in various forms of behavior that would harass or annoy other patrons; and (3) required patrons "whose bodily hygiene is offensive so as to constitute a nuisance to other persons" to leave the library. *Kreimer*, 958 F.2d at 1262–64.

12. Defendant's assertion that the *Kreimer* court found the public library to be a non-public forum is simply wrong. *See Kreimer*, 958 F.2d at 1262 ("Hence, as a limited public forum, the Library is obligated only to permit the public to exercise rights that are consistent with the nature of the Library and consistent with the government's intent in designating the Library as a public forum.").

rum when it authorized its public library system. In a resolution it adopted in 1995 and reaffirmed last year, defendant declared that its "primary objective ... [is] that the people have access to all avenues of ideas." *See* Pls.Ex. 5, Loudoun County Library Board of Trustees Resolution, *Freedom For Ideas—Freedom From Censorship,* May 15, 1995 ("May 15 Resolution"). Furthermore, the same resolution states that the public interest requires "offering the widest possible diversity of views and expressions" in many different media, not diminishing the library collection simply because "minors might have access to materials with controversial content," not excluding any materials because of the nature of the information or views within, and not censoring ideas. *Id.* We find that defendant intended to designate the Loudoun County libraries as public fora for the limited purposes of the expressive activities they provide, including the receipt and communication of information through the Internet.[13]

### 2. *Extent of Use*

As to the extent of use the government has allowed, defendant has designated the library for the use of "the people" and has declared that "[l]ibrary access and use will not be restricted nor denied to anyone because of age, race, religion, origin, background or views." *Id.* Defendant has opened the library to the use of the Loudoun County public at large and has significantly limited its own discretion to restrict access, thus indicating that it has created a limited public forum. *See Kreimer,* 958 F.2d at 1260 (finding that the extent of use inquiry favored concluding that the library was a limited public forum because the library "does not retain unfettered discretion governing admission").

### 3. *Nature of the Forum*

The final consideration is whether the nature of the forum is compatible with the expressive activity at issue. While the nature of the public library would clearly not be compatible with many forms of expressive activity, such as giving speeches or holding rallies, we find that it is compatible with the expressive activity at issue here, the receipt and communication of information through the Internet. Indeed, this expressive activity is explicitly offered by the library.

All three of these factors indicate that the Loudoun County libraries are limited public fora and, therefore, that defendant must "permit the public to exercise rights that are consistent with the nature of the Library and consistent with the government's intent in designating the Library as a public forum." *Id.* at 1262. The receipt and communication of information through the Internet is consistent with both.

Because the Policy at issue limits the receipt and communication of information through the Internet based on the content of that information, it is subject to a strict scrutiny analysis and will only survive if it is "necessary to serve a compelling state interest and ... is narrowly drawn to achieve that end." *Perry,* 460 U.S. at 45, 103 S.Ct. 948 (citing *Carey v. Brown,* 447 U.S. 455, 461, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)).[14]

### C. *Renton/Time, Place, and Manner*

▮▮▮ Defendant also argues in the alternative that the strict scrutiny standard should not apply because the Policy is more appropriately viewed as a time, place, and manner restriction pursuant to *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41,

---

13. This includes both the right to provide information and the right to receive information. *See Kreimer,* 958 F.2d at 1250–55 (citing, *inter alia, Martin v. City of Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); *Griswold v. Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) ("The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read....")).

14. In *Kreimer,* the Third Circuit determined that none of the regulations at issue were subject to strict scrutiny review because none of them were content-based limitations on the kind of expressive activity permitted in the library. *Kreimer,* 958 F.2d at 1262 ("Significantly, the parties do not contend that any of the challenged regulations purport to restrict First Amendment activities on the basis of content or viewpoint.").

106 S.Ct. 925, 89 L.Ed.2d 29 (1986), than as a traditional content-based restriction on speech. Plaintiffs respond that this analysis is inapplicable to the Policy, which is designed to address the primary effects of Internet speech and which defendant admits restricts speech based on content.

In *Renton*, the Supreme Court found that a zoning ordinance prohibiting adult movie theaters from locating within 1000 feet of residential neighborhoods, churches, and specific other structures was a content-neutral time, place, and manner restriction because it could be justified without reference to the content of the speech in the theaters. The city justified the ordinance as necessary to address the secondary effects of adult theaters in certain neighborhoods, namely preventing crime, protecting retail trade, maintaining property values, and preserving the quality of the neighborhoods, districts, and life. *See id.* at 48, 106 S.Ct. 925. The Court found that none of these secondary effects were related to the content of the movies shown at the theaters. Therefore, the Court found the ordinance to be constitutional. *See id.* at 54, 106 S.Ct. 925.

In a subsequent decision clarifying what it meant by "secondary effects," the Supreme Court held that "[r]egulations that focus on ... [l]isteners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton*." *Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). More recently, in construing the Communications Decency Act, the Court stated that "content-based blanket restrictions on speech ... cannot be 'properly analyzed as a form of time, place, and manner regulation'" *Reno v. ACLU*, 521 U.S. 844, 117 S.Ct. 2329, 2342, 138 L.Ed.2d 874 (1997).

Defendant contends that the Policy is designed to combat two secondary effects: creating a sexually hostile environment and violating obscenity, child pornography, and harm to juveniles laws. Neither of these are secondary effects and neither can be justified without reference to the content of the speech at issue. The defendant's concern that without installing filtering software, Internet viewing might lead to a sexually hostile environment is solely focused on the reaction of the audience to a certain category of speech. As the Supreme Court noted in *Boos*, this is not a secondary effect. The defendant's second concern is the possible violation of various criminal statutes that address materials deemed to be obscene, involve child pornography, or are harmful to juveniles. These criminal statutes define prohibited speech only by and because of its content. Far from addressing secondary effects of speech, these statutes focus on the very speech itself.

Indeed, the Fourth Circuit has recently observed that content-neutrality is a prerequisite to the constitutionality of time, place, and manner restrictions on expressive conduct on public grounds. *See United States v. Johnson*, No. 97–5023, 159 F.3d 892, 1998 WL 781215, *3 (4th Cir. Oct.28, 1998). Therefore, defendant's admission that the Policy discriminates against speech based on content indicates that it would not be constitutional even if it were a time, place, and manner restriction.

### IV. Constitutionality of the Policy

Defendant contends that even if we conclude that strict scrutiny is the appropriate standard of review, the Policy is constitutional because it is the least restrictive means to achieve two compelling government interests: "1) minimizing access to illegal pornography; and 2) avoidance of creation of a sexually hostile environment...." Def. Brief in Opp. at 25. Plaintiffs and intervenors respond that there is no evidence that the Policy is necessary to further these interests nor that it is the least restrictive means available. Moreover, they argue that the Policy imposes an unconstitutional prior restraint on speech.

A content-based limitation on speech will be upheld only where the state demonstrates that the limitation "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (citing *Carey v. Brown*, 447 U.S. 455, 461, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)). This test involves three distinct inquiries: (1) whether the interests

asserted by the state are compelling; (2) whether the limitation is necessary to further those interests; and (3) whether the limitation is narrowly drawn to achieve those interests.

### A. Whether the Defendant's Interests Are Compelling

Defendant argues that both of its asserted interests are compelling. Although plaintiffs and intervenors argue that these interests were not really the motivating factors behind the Policy and that they are not furthered by the Policy, they do not argue that the interests themselves are not compelling. For the purposes of this analysis, therefore, we assume that minimizing access to illegal pornography[15] and avoidance of creation of a sexually hostile environment[16] are compelling government interests.

### B. Whether the Policy is Necessary to Further Those Interests

■ To satisfy strict scrutiny, defendant must do more than demonstrate that it has a compelling interest; it must also demonstrate that the Policy is necessary to further that interest. In other words, defendant must demonstrate that in the absence of the Policy, a sexually hostile environment might exist and/or there would be a problem with individuals accessing child pornography or obscenity or minors accessing materials that are illegal as to them. Defendant "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 664,

114 S.Ct. 2445, 129 L.Ed.2d 497; *see also Johnson*, 865 F.Supp. at 1439 ("[S]imply alleging the need to avoid sexual harassment is not enough[;] ... the defendant[ ] must show that the threat of disruption is actual, material, and substantial."). The defendant bears this burden because "[t]he interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship." *Reno v. ACLU*, 521 U.S. 844, 117 S.Ct. 2329, 2351, 138 L.Ed.2d 874 (1997).

The only evidence to which defendant can point in support of its argument that the Policy is necessary consists of a record of a single complaint arising from Internet use in another Virginia library and reports of isolated incidents in three other libraries across the country. In the Bedford County Central Public Library in Bedford County, Virginia, a patron complained that she had observed a boy viewing what she believed were pornographic pictures on the Internet. *See* Pls. Ex. 15 at 4–7. This incident was the only one defendant discovered within Virginia and the only one in the 16 months in which the Bedford County public library system had offered unfiltered public access to the Internet. After the incident, the library merely installed privacy screens on its Internet terminals which, according .to the librarian, "work great". *Id.* at 4.

The only other evidence of problems arising from unfiltered Internet access is described by David Burt, defendant's expert, who was only able to find three libraries that allegedly had experienced such problems, one in Los Angeles County,[17] another in

---

**15.** *See* Protection of Children Against Sexual Exploitation Act, 18 U.S.C. §§ 2251–2260 (1984 & Supp.1998) (criminalizing activities related to child pornography); 18 U.S.C. § 1465 (1984 & Supp.1998) (criminalizing transportation of obscene materials in interstate commerce). However, to the extent defendant's concern is with its own criminal liability, the Fourth Circuit has clearly stated that service providers are not liable "for information originating with a third-party user of the service." *See Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir.1997).

**16.** We note, however, that the legal concept of a sexually hostile work environment has traditionally been limited to the employment context, *see,*

e.g., Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (1994); *Johnson v. Los Angeles Fire Dept.*, 865 F.Supp. 1430, 1439 (C.D.Cal.1994) ("There is no doubt that the prevention of sexual harassment is a compelling government interest."), and, more recently, the education context, *see Gebser v. Lago Vista Independent School District*, —— U.S. ——, ——, 118 S.Ct. 1989, 2000, 141 L.Ed.2d 277 (1998).

**17.** Quoting a newspaper article, Burt reported that library computers "are regularly steered to online photos of naked women, digitized videos of sex acts and ribald chat-room discussions," causing legitimate researchers to have to wait in line while others read "personal ads or X-rated

Orange County, Florida,[18] and one in Austin, Texas.[19] *See* Burt Rep. at 14. There is no evidence in the record establishing that any other libraries have encountered problems; rather, Burt's own statements indicate that such problems are practically nonexistent. *See* Burt Dep. at 253–55 (acknowledging that an e-mail requesting information about sexual harassment complaints relating to Internet use that he sent to "several thousand" librarians did not yield a single serious response). Significantly, defendant has not pointed to a single incident in which a library employee or patron has complained that material being accessed on the Internet was harassing or created a hostile environment. As a matter of law, we find this evidence insufficient to sustain defendant's burden of showing that the Policy is reasonably necessary. No reasonable trier of fact could conclude that three isolated incidents nationally, one very minor isolated incident in Virginia, no evidence whatsoever of problems in Loudoun County, and not a single employee complaint from anywhere in the country establish that the Policy is necessary to prevent sexual harassment or access to obscenity or child pornography.

## C. Whether the Policy Is Narrowly Tailored to Achieve the Compelling Government Interests

■ Even if defendant could demonstrate that the Policy was reasonably necessary to further compelling state interests, it would still have to show that the Policy is narrowly tailored to achieve those interests. The parties disagree about several issues relating to whether the Policy is narrowly tailored: (1) whether less restrictive means are available; (2) whether the Policy is overinclusive; and (3) whether X–Stop, the filtering software used by defendant, is the least restrictive filtering software available.[20]

### 1. Whether Less Restrictive Means Are Available

Defendant alleges that the Policy is constitutional because it is the least restrictive means available to achieve its interests. The only alternative to filtering, defendant contends, is to have librarians directly monitor what patrons view. Defendant asserts this system would be far more intrusive than using filtering software. Plaintiffs and intervenors respond that there are many less restrictive means available, including designing an acceptable use policy, using privacy screens, using filters that can be turned off for adult use, changing the location of Internet terminals, educating patrons on Internet use, placing time limits on use, and enforcing criminal laws when violations occur.

In *Sable Communications of Calif., Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), the Supreme Court noted that "[t]he Government may ... regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest." In *Sable* the Court declared unconstitutional a statute banning all "indecent" commercial telephone communications. The Court found that the government could not justify a total ban on communication that is harmful to minors, but not obscene, by arguing that only a total ban could completely prevent children from accessing indecent messages. *Id.* at 128, 109 S.Ct. 2829. The Court held that without evidence that less restrictive means had "been tested over time," the government had not carried its burden of proving that they

chat rooms." Burt Rep. at 14 (quoting *Public Libraries Debating How to Handle Net Porn*, August Chron., July 3, 1997).

**18.** Burt alleges that filters had to be installed in Orange County libraries after patrons were accessing hard-core porn sites "for hours on end." *Id.* (quoting Pamela Mendels, *A Library That Would Rather Block Than Offend*, N.Y. Times, Jan. 18, 1997).

**19.** The Austin library installed filters after two incidents. In the first, a librarian caught a pa-

tron printing child pornography on the library printer. In the second incident, at a different branch, an adult patron was caught teaching children how to access pornography on the Internet. *See id.* at 14–15 (citing Mark Smith, *Meeting the Pressure to Filter*, Tex. Library J., Feb. 1997).

**20.** Although they dispute the legal conclusion to be drawn from the facts in the record, the parties do not dispute the facts themselves. Therefore, summary judgment remains the appropriate vehicle for resolving this dispute.

would not be sufficiently effective. *Id.* at 128–29, 109 S.Ct. 2829.

We find that the Policy is not narrowly tailored because less restrictive means are available to further defendant's interests and, as in *Sable,* there is no evidence that defendant has tested any of these means over time. First, the installation of privacy screens is a much less restrictive alternative that would further defendant's interest in preventing the development of a sexually hostile environment. *See* Pls.Ex. 15 at 4, Letter from Tom Hehman to Douglas Henderson (stating that privacy screens "work great"). Second, there is undisputed evidence in the record that charging library staff with casual monitoring of Internet use is neither extremely intrusive nor a change from other library policies. *See, e.g., id.* (noting no problems with the library staff being responsible for " 'shooing' people away from sites we know are objectionable, just as we always have with prepubescent boys giggling over gynecological pictures in medical books"); *see generally* Pls.Ex. 15 (providing the Internet use policies of other Virginia libraries, many of which threaten loss of library privileges or prosecution for accessing illegal sites) Third, filtering software could be installed on only some Internet terminals and minors could be limited to using those terminals. Alternately, the library could install filtering software that could be turned off when an adult is using the terminal. While we find that all of these alternatives are less restrictive than the Policy, we do not find that any of them would necessarily be constitutional if implemented. That question is not before us.

### 2. *Whether the Policy Is Overinclusive*

Defendant contends that the Policy is neither overinclusive nor underinclusive because it is the least restrictive means available. Defendant also asserts that we should not focus on the specifics of what the Policy does and does not cover because that would detract from the broader issue of "whether a public library can or cannot filter obscene materials on its public Internet terminals and, if so, under what criteria and procedures." Def. Brief in Opp. at 4. In other words, the defendant asks this Court to consider a hypothetical situation that is not before us. The federal courts, however, may not provide advisory opinions; we may rule only on the Policy before us. Defendant cannot save its Policy by asking the Court to decide hypothetical questions for which there is no case or controversy.

 In examining the specific Policy before us, we find it overinclusive because, on its face, it limits the access of all patrons, adult and juvenile, to material deemed fit for juveniles. It is undisputed that the Policy requires that "[i]f the Library Director considers a particular website to violate ... [the Virginia Harmful to Juveniles Statute], the website should be blocked under the policy for adult as well as juvenile patrons." Pls. Ex. 10, Def. Resp. to Pls. First Req. for Admiss. 35. It has long been a matter of settled law that restricting what adults may read to a level appropriate for minors is a violation of the free speech guaranteed by the First Amendment and the Due Process Clause of the Fourteenth Amendment. *See Reno v. ACLU,* 521 U.S. 844, 117 S.Ct. 2329, 2346, 138 L.Ed.2d 874 (1997) ("It is true that we have repeatedly recognized the governmental interest in protecting children from harmful materials but that interest does not justify an unnecessarily broad suppression of speech addressed to adults.") (citations omitted); *Butler v. Michigan,* 352 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957) (restricting adults to what is appropriate for juveniles is "not reasonably restricted to the evil with which it is said to deal").

At issue in *Reno* was a federal statute, the Communications Decency Act ("CDA"), which established a criminal penalty for providing on the Internet material deemed harmful to minors although not obscene with the knowledge that such material could be accessed by minors. The Supreme Court found that because there was no way for an Internet provider to block minors from accessing such material, this statute effectively prohibited such material from being displayed at all. *Reno,* 117 S.Ct. at 2347. The Court held that

[i]n order to deny minors access to potentially harmful speech, the CDA effectively

suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another. That burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve. *Id.* at 2346. Because we have found that less restrictive alternatives are available to defendant and that defendant has not sufficiently tried to employ any of them, *see* III.C.1., the Policy's limitation of adult access to constitutionally protected materials cannot survive strict scrutiny.

### 3. Whether X–Stop Is the Least Restrictive Filtering Software

 Defendant claims that X–Stop is the least restrictive filtering software currently available and, therefore, the Policy is narrowly tailored as applied. Our finding that the Policy is unconstitutional on its face makes this argument moot. A facially overbroad government policy may nevertheless be saved if a court is able to construe government actions under that policy narrowly along the lines of their implementation, if the policy's text or other sources of government intent demonstrate "a clear line" to draw. *See Reno,* 117 S.Ct. at 2350–51. We find no such clear line here. Defendant has asserted an unconditional right to filter the Internet access it provides to its patrons and there is no evidence in the record that it has applied the Policy in a less restrictive way than it is written. *See* Def. Resp. to Pl First Req. Admiss. 17 (denying that X–Stop does not block access to soft core pornography, which is protected). Therefore, our finding that the Policy is unconstitutional on its face makes any consideration of the operation of X–Stop moot.

### V. Prior Restraint

 Plaintiffs and intervenors allege that even if the Policy were to survive strict scrutiny analysis, the Court would have to find it unconstitutional under the doctrine of prior restraint because it provides neither sufficient standards to limit the discretion of the decisionmaker nor adequate procedural safeguards. Defendant responds that the Policy is not a prior restraint because it only pro-

hibits viewing certain sites in Loudoun County public libraries, and not in the whole of Loudoun County.

 Preventing prior restraints of speech is an essential component of the First Amendment's free speech guarantee. *See Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). "Permitting government officials unbridled discretion in determining whether to allow protected speech presents an unacceptable risk of both indefinitely suppressing and chilling protected speech." *11126 Baltimore Boulevard, Inc. v. Prince George's County,* 58 F.3d 988, 994 (4th Cir.1995). In *11126,* the Fourth Circuit found that

> [t]he guarantee of freedom of speech afforded by the First Amendment is abridged whenever the government makes the enjoyment of protected speech contingent upon obtaining permission from government officials to engage in its exercise under circumstances that permit government officials unfettered discretion to grant or deny the permission.... Such discretion exists when a regulation creating a prior restraint on speech fails to impose adequate standards for officials to apply in rendering a decision to grant or deny permission or when a regulation fails to impose procedural safeguards to ensure a sufficiently prompt decision.

> [The following procedural safeguards have been required by the Supreme Court:] "(1) any restraint prior to judicial review can be imposed only for a specific brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court."

*Id.* at 996 (quoting *Freedman,* 380 U.S. at 58–60, 85 S.Ct. 734). In other words, even unprotected speech cannot be censored by administrative determination absent sufficient standards and adequate procedural safeguards. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 562, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) ("Whatever the reasons may have been for the board's exclu-

sion of the musical, it could not escape the obligation to afford appropriate procedural safeguards. We need not decide whether the ... production is in fact obscene.").

 Defendant argues that prior restraint cases are limited to situations in which a government tries to restrict all speech within its jurisdiction. Because Loudoun County residents are still permitted to obtain unfiltered Internet access in their homes or offices, defendant asserts, this situation is distinguishable from those cases. We find no legal support for this argument. *See Reno,* 117 S.Ct. at 2349 (" '[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' ") (quoting *Schneider v. New Jersey,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939)); *Southeastern Promotions,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448. In *Southeastern Promotions,* a municipality had denied the use of a public facility for the production of the musical "Hair", which it deemed obscene. The Court found that "it does not matter ... that the board's decision might not have had the effect of total suppression of the musical in the community. Denying use of the municipal facility under the circumstances present here constituted the prior restraint." 420 U.S. at 556, 95 S.Ct. 1239.

It is undisputed that the Policy lacks any provision for prior judicial determinations before material is censored. *See* Pls.Ex. 10, Def. Res. to Pls. First Req. for Admiss. 31. We find that the Policy includes neither sufficient standards nor adequate procedural safeguards. As to the first issue, the defendant's discretion to censor is essentially unbounded. The Policy itself speaks only in the broadest terms about child pornography, obscenity, and material deemed harmful to juveniles and fails to include any guidelines whatsoever to help librarians determine what falls within these broad categories. *See* Pls.

Ex. 12, Def. Answer to Pls. First Req. for Interrogs. 3 ("[T]here is no information beyond the Policy itself that constitutes the 'criteria' used for unblocking specific sites."). There are no standards by which a reviewing authority can determine if the decisions made were appropriate.

The degree to which the Policy is completely lacking in standards is demonstrated by the defendant's willingness to entrust all preliminary blocking decisions—and, by default, the overwhelming majority of final decision [21]—to a private vendor, Log–On Data Corp. Although the defendant argues that X–Stop is the best available filter, a defendant cannot avoid its constitutional obligation by contracting out its decisionmaking to a private entity. Such abdication of its obligation is made even worse by the undisputed facts here. Specifically, defendant concedes that it does not know the criteria by which Log–On Data makes its blocking decisions. *See* Bradshaw Dep. at 12–13 (stating that Log–On Data has refused to provide defendant with the criteria it uses to block sites). It is also undisputed that Log–On Data does not base its blocking decisions on any legal definition of obscenity or even on the parameters of defendant's Policy. *See* Bradshaw Dep. at 36–37 (agreeing that "there is neither any attempt nor the ability by [Log–On Data] to apply a legal test"). Thus, on this record, we find that the defendant has not satisfied the first prong of prior restraint analysis, establishing adequate standards.

In addition, the Policy also fails to include adequate procedural safeguards. The three minimum procedural safeguards required are (1) a specific brief time period of imposition before judicial review; (2) expeditious judicial review; and (3) the censor bearing the burden of proof. The Policy, even including the alleged protections of the unofficial 'unblocking policy', is inadequate in each of these respects.[22] First, the Policy itself con-

---

**21.** Defendant claims that the library staff has reviewed "more than 172" websites, *see* Henderson Decl. at ¶¶ 9–10, out of the approximately 80,000 that X–Stop currently blocks. *See* Burt Dep. at 222.

**22.** The defendant relies on the undisputed evidence that it has not denied any of the eleven

unblocking requests it has received thus far to save the Policy. *See* Henderson Decl. at ¶ 16. This is insufficient because, as we noted in our previous opinion, "forcing citizens to publicly petition the Government for access to" disfavored speech has a "severe chilling effect." *Mainstream Loudoun,* 2 F.Supp.2d at 797 (citing

tains no provision for administrative review, no time period in which any review must be completed, and no provision for judicial review. *See* Pls.Ex. 1, Policy. Under the unofficial 'unblocking policy', a library patron who finds herself blocked from an Internet site she believes contains protected speech is required to request in writing that the librarians unblock the specified site. *See* Pls.Ex. 4, Internet Procedures at ¶ 13. If the librarian determines that the site does not fall within the Policy's prohibitions, he will unblock it, although there is no systematic way in which this is done. *See* Henderson Dep. at 368–71. There is no time period during which this review must occur and there is no provision for notifying the requesting patron if and when a site has been unblocked. *See id.;* Timmerman Dep. at 93–94 (stating that neither patrons nor staff are informed when the defendant unblocks a site).

The second required procedural safeguard is expeditious judicial review after the administrative decision is made. There is no provision whatsoever in the Policy for judicial review of any blocks. *See* Pls.Ex. 1, Policy. This makes the question of who carries the burden of proof in any judicial review proceeding, the third required procedural safeguard, moot. Because the Policy has neither adequate standards nor adequate procedural safeguards, we find it to be an unconstitutional prior restraint.

### VI. Severability

While neither party addresses the issue, the Policy includes a provision that if a part of it is overruled, "remaining portions remain in effect." Pls.Ex. 1 at 2. In *Reno,* the Supreme Court severed provisions of the CDA, declaring its prohibition of "indecent material" unconstitutional but allowing the prohibition on obscene material to remain in effect "because [obscene materials] enjoy[ ] no First Amendment protection." 117 S.Ct. at 2350. The CDA, however, unlike the Policy, did not operate as an unconstitutional

prior restraint; rather, it provided for criminal penalties only after a judicial determination that obscene material had been furnished. Because we have concluded that section 2 under the heading "Internet Services Provided" constitutes an unconstitutional prior restraint on speech, and that section 2 permeates the rest of the Policy, we hold that defendant's Policy on Internet Sexual Harassment is unconstitutional.

### VII. Conclusion

■ Although defendant is under no obligation to provide Internet access to its patrons, it has chosen to do so and is therefore restricted by the First Amendment in the limitations it is allowed to place on patron access. Defendant has asserted a broad right to censor the expressive activity of the receipt and communication of information through the Internet with a Policy that (1) is not necessary to further any compelling government interest; (2) is not narrowly tailored; (3) restricts the access of adult patrons to protected material just because the material is unfit for minors; (4) provides inadequate standards for restricting access; and (5) provides inadequate procedural safeguards to ensure prompt judicial review. Such a policy offends the guarantee of free speech in the First Amendment and is, therefore, unconstitutional.

For these reasons, the intervenors' Motion to Substitute Parties will be GRANTED; the plaintiffs' and intervenors' motions for summary judgment will be GRANTED; and the defendant's Motion for Summary Judgment will be GRANTED as to the standing of John Ockerbloom d/b/a Banned Books On-Line and DENIED in all other respects. Defendant will be permanently enjoined from enforcing its Policy on Internet Sexual Harassment. An appropriate order will issue.

*Lamont v. Postmaster General,* 381 U.S. 301, 307, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965)); *see also Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury."). At least one patron has stated that he failed to request access to a blocked site he believed was improperly blocked because he was "intimidated to have to go through that procedure." Pls.Ex. 19, Kropat First Decl. at ¶ 7.

The clerk is directed to forward a copy of this Memorandum Opinion to counsel of record.